RECEIVED
SCRANTON

IN THE UNITED STATES DISTRICT COURT APR 2 0 2000
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PER _____
DEPUTY CLERK

Dale Arnold
          petitioner
    v
Frederick Frank, et.al.
          respondent

## 1 : CV00-0775

Case No._____

FILED
SCRANTON

APR 2 8 2000

PER _____
DEPUTY CLERK

Memorandum of Law in Support
of Habeas Corpus Petition

Now comes, Petitioner, Dale Arnold, acting pro se, and respectfully
files this Memorandum of Law in support of his Petition for Writ of
Habeas Corpus;

In order to simplifty, this Memorandum consists of the grounds as
presented the Pennsylvania Superior Court, and Supreme Court, and
appeal from Post-Conviction proceedings, renumbered in accordance
with this Petition. Petitioner believes this format will provide
sufficient elaboration on the Issues, while showing that they were
fully presented to the Commonwealth Courts for Consideration.

A-1/6,

*Ground One*

/DID THE HONORABLE PRETRIAL HEARING COURT ERR IN REFUSING
TO DISMISS THE CHARGES AND DISCHARGE THE APPELLANT DUE TO A VIOLATION
OF HIS CONSTITUTIONAL RIGHT OF DUE PROCESS ARISING FROM THE
DELAY BETWEEN THE CRIME AND HIS ARREST?

The death of Phillip Evans occurred on May 15, 1979.
As shall be seen, the Commonwealth was in receipt of virtually
every shred of evidence which they presented at the trial within
forty-five (45) days of the date of the offense. However, they
chose to wait some fifteen (15) months before bringing charges
against Arnold. In the interim, an essential alibi witness whom
Arnold would have liked to have called, died.

The line of Appellate Court precedent in these matters
begins with the case of Ross v. United States, 121 U.S. APP.
D.C. 233, 349 F.2d 210 (1965). In that case, the Court reversed
the conviction due to an unjustified pre-arrest delay which had
resulted in the Defendant's inability to recall the events at
the time of the offense. Since that case, Pennsylvania Courts
have held that when evaluating due process claims of this type
the Courts must focus upon the strength and corroboration of
the incriminating identification. Commonwealth v. McCloud, 218
Pa. Super. 230, 275 A.2d 841 (1971).

35

This Court has previously set forth a balancing test which measures the need for the delay of the arrest of the Defendant against the prejudice to his rights. Commonwealth v. DeRose, 225 Pa. Super. 8, 307 A.2d 425 (1973). This test was again given approval by the McCloud Court. When no sufficient justification for the delay by the prosecution has been presented, "no weight should be given to the Commonwealth's side of the balance". United States v. Jones, 322 F.Supp. 1110 (E.D.PA. 1971).

A number of cases have held that the mere fact of an unjustified delay is not sufficient in and of itself to justify the dismissal of the charges. It is then that an examination as to the strength of the prosecution's case against the Defendant must be undertaken.

There is no set time limit at which an accused's rights are violated. In the case of Woody v. U.S., 370 F.2d 214, a period of four (4) months was deemed sufficient under those circumstances. Other cases are U.S. v. Jones, Supra., holding five (5) months was an inordinate delay and Ross v. U.S., Supra. indicating seven (7) months was violative of the Defendant's rights.

Plus there was no Cautionary Instructions given on this issue.

Two United States Supreme Court cases set forth the parameters of the Courts' examination in such matters. United

3

<u>s</u>tates v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.ed.2d 468
(1971) indicated that the due process clause of the United States

   Constitution "would require dismissal of the indictment if
it were shown that the preindictment delay caused substantial
prejudice to the Defendant's rights to a fair trial and that
the delay was an intentional device to gain tactical advantage
over the accused".  Further, the <u>Marion</u> Court pointed out that
these  considerations are particularly important in cases concerning
murder prosecutions inasmuch as there is no statute of limitations
protecting the accused under such circumstances.

     Much of the case law which has evolved pursuant to
this question has concerned narcotics arrests.  A line of cases
has developed which indicates that in many circumstances there
is a recognizable need for the police to protect both their
undercover agents and informants.  See <u>Commonwealth v. Barnes</u>,
237 Pa. Super. 407, 352 A.2d 107 (1975); <u>Commonwealth v. McCloud</u>,
Supra.  Also, there are cases which indicate that the inability
of the police to discover the whereabouts of a Defendant may
also result in a decision that the delay is permissible. See
<u>Commonwealth v. Sanders</u>, 260 Pa. Super. 358, 394 A.2d 591 (1978);
<u>Commonwealth v. Cluck</u>, 252 Pa. Super 228, 381 A.2d 472 (1977).

     The Commonwealth points to the case of <u>Commonwealth
v. Daniels</u>, 480 Pa. 340, 390 A.2d 172 (1978).  That case involves

a murder prosecution with a delay of approximately six and one-half
(6½) years.  However, the Daniels Court also fully discussed
the case of United States v. Lovasco, 431 U.S. 783, 97 S.Ct.
2444, 52 L.ed.2d 752 (1977).  In that case the Supreme Court
of the United States held that an inquiry into the prosecution's
rationale for the delay is not required until a claim of prejudice
has been made out by the Defendant.  However, in that case the
Defendant took the witness stand and indicated that two witnesses
whom he would have liked to have called at his trial were unavailable
due to their deaths which had occurred in the period between
the incident and his arrest.  However, in that case the Defendant
never stated from the witness stand or elucidated what these
witnesses would have testified to, if they had been available.

The Trial Court in its opinion found that there was
no prejudice shown in the instant case.  The defense respectfully
submits that pursuant to the guidelines of Lovasco, prejudice
has most certainly been shown.  The Defendant testified at the
pre-trial hearing as to the name, address, and content of testimony
which the deceased witness would have supplied, had he been available.
Unlike the majority of the cases which have been cited, in
the instant case, there was never an identification by anyone,
much less a questionable identification.  The time of the delay
in this case is between fourteen (14) and fifteen (15) months.

At the pre-trial hearing, members of the State Police were called
to the stand and examined as to their rationale for the  delay.
Their explanations varied but it became clear through their testimony
that while they were in receipt of the evidence concerning Arnold
in June 1979, an arrest was not made.  A State Police Lieutenant
admitted on the witness stand that he was appointed to replace
the prior station commander to "sweep things up and get things
moving".  It is obvious that the State Police themselves were
 aware of problems regarding as to effecient prosecution of cases
in this area.  Also, the District Attorney himself was called.
Members of the State Police,  spoke about having had discussions
concerning "whether it would be in our best interest to wait
until Mr. Frawley assumed the office of District Attorney". (See
N.T. pre-trial hearing, February 9, 1981).

     The Commonwealth sought to justify the delay in this
case by indicating that inasmuch as the victim of this matter
had previously identified an individual and then recanted her
identification,  they wanted to be more positive before making
a second arrest.  They indicate that they were waiting for Miss
Moran to undergo further therapy.  However, when Miss Moran's
psychiatrist finally testified at the pre-trial hearing, it became
blatantly obvious that there was little, if any, contact by the
State Police or the Prosecution with her office in any way, shape

6

or form. The Commonwealth is grasping at straws in an attempt
to justify an unjustifiable delay.  There has been prejudice
shown under the case law.  This is a murder case and requires
a more strict interpretation of the law.  No amount of stretching
by the Commonwealth would be sufficient under the case law to
justify a delay of such length.

The Appellant respectfully submits that the prejudicial
delay resulted in a basic denial of his Constitutional right
of due process and that as a result the charges against him should
be dismissed and he discharged.

There was no Alibi Instructions given in this case or Instructions
on In-ordinate Delay of 15 months.

*Ground two* | Common-Law Marriage

<u>Inadmissable Admittance of testimony by Petitioner's Wife.</u>

The Honorable Trial Court err in permitting the witness Lula Felicita

to testify over the Petitioner's objections as to Incompetency

resulting from her Common-Law Marriage to the Petitioner.

The marital privilege in criminal proccedings is codified in this

Commonwealth in 5914 of the Judicial Code, 42 Pa.C.S.A. In this instance

the Trial Court held a lengthy evidentiary hearing during the trial

pertaining to the existence of a valid Common-Law Marriage between a

witness called by the Commonwealth and the Petitioner.

At Common-Law, a person was held to be incompetent to testify either

for or against his or her spouse. In the case of <u>Comm.v.Walton</u>,245,Pa.A.

Super,169,369,A2d.347.(1977). the Pennsylvania Superior Court held that

the same rules applied to a Common-Law Marriage as to a legitimate

marriage. The Petitioner submits that utilizing the standards set forth

in the case of <u>McGrath's Estate</u>,319 Pa.309,179.A2d.599, a Common-Law

Marriage was established before the court in this case. See also

<u>Comm.Jones</u>,224.Pa.Super.352,307.A2d..397.(19__). The Petitioner

respectfully submits that the trial Court erred in permitting the

testimony of Lula Felicita over its objections inasmuch as she was

incompetent to testify against the Petitioner due to her status as the

Common*law Wife of the Petitioner.

The Petitioner is cognizant of the fact that the burden of proof lies with the parth alleging a witness's incompetency. Beeruk Estate, 429,Pa.415,241.A2d.755.(1968). Further, the Petitioner has raised this issue both during trial and in post verdict motions. Therefore, the matter is properly before this Court.

The Petitioner respectfully submits that her testimony could not be termed "harmless" inasmuch as it was her testimony that linked the Petitioner to the murder weapon in this case. The Supreme Court of Pennsylvania has held that Error is harmless only when an Appellate Court determines that the error could not have contributed to the verdic Com.v.Story,476.Pa.391.383.A2d.155.(1978). Consequently, whenever there is a " reasonable possibility " that an error " might have contributed to the conviction ", the error is nor harmless. Com.v.Davis ,452.Pa.171,305.A2d.715.(1973). In order to make such a determination, the Court must examine the uncontradicted prosecution evidence and decide whether it is overwhelming in comparison to the improperly admitted evidence. Com.v.Parks,273.Pa.Super.506,417.A2d.1163

9

Petitioner had a hearing on this Common*Law Marriage issue, many of Petitioner's friends and co-workers testified that they seen Lula Felicita with the Petitioner at Partys, and they knew her as the Petitio old Lady, (his wife), or new that the Petitioner had an old lady. Petitioner's wifes mother testified that her daughter was married to the Petitioner. The Petitioners mother testified that he was married Lula Felicita. There is many witness to this Common-Law Marrage. Plus when the Petitioner went to the Bradford County Jail, Lula Felicita signed in as the Petitioners Wife. When the Petitioner was sent to the Dallas State Prison, Lula Felicita always signed in as Wife, and most of the Prison Guards knew Lula Felicita as the Petioners wife.

The Penna. State Law States, as long as a Male and Female are at lease 7 years old, they can become married by declaring in front of witness their desire to be man and wife.     See case's

Jewett v.Jewett,305,1961,196.Pa.Sup.Ct.305.175.A2d.141.(1951).

Interest of Miller,301.Pa.Supp.Ct.511,1982. Key.18.

Lula Felicita and the Petitioner has been Common-Law Married since September of 1978, and the Petitioner was arrested August of 1980.

Petitioner was highly prejudiced in the eyes and minds of the empaneled jurors in his criminal trial by the fact that inadmissable testimony was introduced and admitted at Petitioner's criminal trial from his Common-Law Wife who gave damaging testimony which denied Petitioner a fair and impartial trial, his Right to Due Process of the Law which are mandated as such as law in the Constitution of the U.S.A., all of which the above is in direct contary to the law and indirect violation of same said laws.

Petitioner's United States of America Constitutional Rights were violated by all prior counsel which rendered ineffective by failing to adequately argue and preserve one and/all of the following issues raised in this instant motion which are as follows below and minus all prior counsel errors the final outcome would more than likely to have reasonably different.

Common-Law Marriage Laws

<u>Freedom</u>, Law of Marriage and Divorce in Pa.., 47-50 a.

<u>Buradus v.General Cement Products Co</u>..,1947,52.A2d.205,356,Pa.349.

<u>In Re.Garge's Estate</u>,1977,378,A2d.307.474.Pa.237.

<u>Manfredi v.Estate</u>,399.Pa.285.291.159.A2d.697.700.(1960).

<u>Warrenberger v.Folsom</u>,1956,140.F.Supp.610.Aff.239.F2d.846.

<u>Blecker's Estate</u>,1955,112,A2d.129.381.Pa,138.

<u>Com.v.Settlers</u>,442.Pa.159.275.A2d.61.1971.

<u>Com.v.Percell</u>,418.A2d.340.79.

<u>In.Re.Estate of Dodge</u>,361.Pa.Super.188.522.A2d.77.(1987).

<u>42.Pa.S.S.A..5913</u>

<u>Beeruk Estate</u>,429.Pa.415.241.A2d.755.(1968).

<u>Com.v.Parks</u>,273.Pa.Supper.506.417.A2d.1163.1979

<u>Chapman v.Calif</u>.386.US.18.(1967).

<u>US.Ex.Rel.Macon v.Yeager</u>.476.F2d.613.(3rd.Cir.1973).

Ground three

The Admissability of Inadmissabliity Testimony of A Witness Using
<u>HYPNOSIS</u> as a Basis for Credibility and Reliability for an Incompetent
Witness for the Prosecution to Gain a Conviction.

Petitioner's U S A. Constitutional Rights were violated by all
prior counsel which rendered ineffective by failing to adequately
argue and preserve one and/all of the following issues raised in this
instant motion which are as follows below and minus all prior counsel
errors the final outcome would more than likely to have reasonably
different.

It is a long standing rule of the court that any testimony elicited
from a person under <u>Hypnosis</u> is inadmissable in a court of law and this
case is no exception.

The PA. State Police, Tpr.Perechinsky did threaten the main witness-
Moran, to arrest her if she didn't cooperate and testify, although
she had perjured herself many times. Moran stated this in open court of
Bradford County. So she testified under the threat of arrest and/or
under duress to say what the police wanted her to say. Moran's statements
are confused of similarities, inconsistencys, fabrications, perjury,
no credibility, not reliable and testimony of criminal falsi.

Moran is the only eye witness to this case. Because of the Drugs
and alochol use, and threats to Moran by the Killer-Kidnapper, and the
Pa.State Police. The District Attorney Frawley wanted Moran to see a
Doctor-Psychologist to be Hypnotized to get out of her any other
information the Pa.State Police and DA. could use. Moran saw this Doctor
Psychologist Marley over a dozen times, and was Hypnotized many times
by this Doctor and the Pa. State Police. Moran Hypnotized statements
were a little different than her other statements. So Moran got a Attorn
to protect her Constitutional Rights, and got an Immunity Deal from
District Attorney Frawley. So Moran testified to everything.

All prior counsel failed to adequately argue and preserve this issue
and therefore minus trial counsels errors the final outcome of the
final decision would more than likely reasonably have been different
and the jury would have found the Petitioner not guilty.
A violation of the 5th, 6th., and 14th. U S.Constitutional Rights.

See and Compare;                    **Hypnosis**

U.S.C.A. 5th.,6th.,and 14th.

Arizona v.Rock, June 1987 case

Denicona,502,A2d..606.

Com.v.Smoyer,505.Pa.83,476.A2d.1304.(1984).

Com.v.Dugger,506.Pa.537,486.A2d.382.(1985).

Com.v.Sheppard,403,491,A2d.879.(1985).

Com.v.Lark,505.Pa.126.129,477.A2d.857.859.

Com.v.Kichlin,468.Pa.265,279,361,A2d.282,290.(1976).

Com.v.Scatena,332.Pa.Super.415,433,481.A2d.855.864.(1984).

Com.v.Chamberlain,332.Pa.Super.108,112,480.A2d.1209.1211.(1984).

Com.v.Romanelli,336.Pa.Super.261,485,A2d.795.(1984).

Com.v.Nazarovilch,496.Pa.97,436.A2d.170.(1981).

Com.v.Taylor,294,Pa.Super.171,439.A2d.805.(1982).

Com.v.McCabe,303,Pa.Super.245,449,A2d.670.(1982).

Peoples v.Guerra,37,Cal.3d.385,690,P.2d.635,208,Cal.Rpt.162.(1984).

Com.v.Gallaher,519.Pa.291.297.547,A2d.355.(1988).

Jay Smith Case.Com.v.Smith.404.Pa.Super.553.591.A2d.730.(1991).

Strickland v.Washington,80.LED.2d.674,104.Sct.(1989).

Ground Four

Conviction obtained by Court erring in Denying the Petition for Post Conviction Relief on the Basis that Trial Counsel was Ineffective in Failing to object to the Testimony of a Psychologist which Bolstered the account given by the Victim.

The Commonwealth called Mary Marley, a clinical psychologist to testify as to whether, based on Jane Moran's mental condition, she would be able to idenify the assailant. The psychologist was called in order to explain that, due to repression, Jane Moran could not identify the assailant, but could describe him. (N T 478-479).

Marley testified that Moran was suffering from repression, and also that this condition affected her everyday life. (N T 491). She testified to a degree of medicial certainty that Moran would not be able to identify the assailant. (N T 494). The defense made no objection to the psychological testimony.

Counsel failed to object to the Commonwealth's use of a psychologist at trial to Bolster the surviving victims testimony, and to explain why the victim would be unable to idenfify the killer. This testimony was inadmissible for this purpose, and defense counsel failed to object to its introduction. Moran, the surviving victim, was perhaps the most important witness at trial. By allowing a psychologist to rationalize the deficiency in her testimony, the defense counsel made a grievous omission which undermined the Truth-Determining Process. The psychologist invaded the Jury's Province of determining the credibility of the witness.

Allowing this testimony could not be considered a reasonable strategic decision on the part of counsel. There was no benefit to the defense as a result of the testimony, rather it impermissibly supported the weakest link of the Commonwealth's Case---the lack of an in-court identification. Due to ineffectiveness of counsel, the Petitioner should receive a New Trial.

Petitioner alleges that prior counsel was ineffective, and there fore any failure to raise these issues was a result of that ineffectiveness. In fact, the majority of the allegations involve counsels failure to raise certain objections or to present certain evidence. Therefore, even since these issues were not raised earlier, failure to raise the issue earlier was not a reasonable tactical decision on the part of counsel. Considering the arguments which follows, these issues should have been raised at trial or direct appeal. The prejudice to the Petitioner as a result of counsels acts and omissions demonstrate the lack of a rational, tactical decision by counsel.

The expert testimony of psychologist Marley should not have been admitted because it impermissibily Bolstered the credibility of the eyewitness. Counsel was ineffective in failing to object to its introduction. The testimony Bolstered the credibility of the eyewitness. The first step in analyzing counsels effectiveness with respect to its failure to call Marley to testify is to determine for what purpose the testimony was elicited. In this case, there was only one eyewitness available to testify at trial, Jane Moran. Moran was able to generally describe the assailant and his truck. However, she was not able to idenitify the assailant.

first

During his offer of proof, the District Attorney, Leonard Frawley indicated:

I would seek to ask this witness that given what occurred during the counseling sessions and given her knowledge that she had arrived at through hypnotic interviews and given her knowledge of the tests that were administered and based on her past experience and education without knowing whether or not Jane had identified an assailant, I would ask her could she, whether or not Jane would be able to identify the assailant. Her answer would be she would not be able to identify the assailant. (p. 478)

The psychologist testified, "it was my clinical impression at the very first session that this young woman had had a very traumatic experience and that she was exhibiting acute anxiety and that the acute anxiety was causing her to repress some of the memories of the emotions, associated with this experience." (p. 488). "... the test results indicated that she was suffering from a traumatic stress syndrome or a traumatic neuroses that occurs after an individual has experienced some very severe trauma, real trauma. It indicated she was indeed using massive repression as a defense mechanism and that she was also using reaction formation defenses and denial as major defense strategies." (p. 490-1).

On p. 494 of the transcript, the prosecutor, Mr. Frawley, asked the psychologist to draw upon her education, experience, and familiarity with Jane Moran's case, and whether she would be able to render an opinion whether the victim was capable to identify the assailant. Ms. Morley testified, "My opinion would be that with the amount of massive repression that continued to exist in this young woman it would be unlikely that she could specifically identify the person." She went on to testify that the reason for her failure to identify him was due to the fear of dying, of him killing her family.

Therefore, the testimony was introduced to explain the victim's failure to identify the assailant by citing psychological problems which would prevent her from doing so. Essentially,

13

this testimony serves to explain a major omission in the evidence from the eyewitness, while bolstering the remaining portions. By saying that it is medically explainable that she would not be able to identify the assailant, the remainder of her testimony is strengthened.

Based on the offer of proof made by the Commonwealth and the testimony given by the psychologist, the main purpose for this testimony was to excuse deficiencies in the victim's testimony.

It should also be noted that much of this testimony can be viewed as "victim impact" testimony, in that it describes the continuing fear and the impact that the crime continued to have on the victim, in terms of difficulty sleeping and trouble performing well at work. (p. 491-492).

> B. The expert testimony was inadmissible for the purpose of bolstering credibility and it was irrelevant for any other purpose.

Presently, it is a well-settled principle that expert testimony cannot be used to bolster the credibility of a witness. Commonwealth v. Loner, 415 Pa.Super. 332, 609 A.2d 1376 (1992), citing Commonwealth v. Seese, 512 Pa. 439, 517 A.2d 920 (1986); Commonwealth v. Spence, 534 Pa. 233, 627 A.2d 1126 (1993).

The cases dealing with this problem generally arise in two separate types of cases: those involving child sexual abuse, and those in which the defendant wishes to call an expert regarding eyewitness identification. While this case law has been developing since the time of this trial, it has its roots in cases which were decided prior to the instant trial.

In Commonwealth v. O'Searo, 466 Pa. 224, 352 A.2d 30 (1976), the defendant attempted to present an expert witness, a psychologist, to substantiate the defendant's claim that he harbored no ill will toward the victim and that he shot the victim by accident. The Court did not permit this testimony for this purpose, because it tended to bolster the credibility of the defendant, which is

14

Bost
4

18

the sole province of the jury.  In explaining its decision, the Court indicated that "to permit psychological testimony for this purpose would be an invitation for the trier of fact to abdicate its responsibility to ascertain the facts relying upon the questionable premise that the expert is in a better position to make such a judgment."  O'Searo at 32.

The O'Searo decision was later cited in Commonwealth v. Smith, 290 Pa.Super. 33, 434 A.2d 115 (1981).  In that case, which was decided by the Superior Court on August 14, 1981, seven months after trial was held in this case, the defendant was not permitted to present an expert witness to testify regarding the ability of identification witnesses to observe the defendant accurately the Court, citing O'Searo, indicated that this testimony involved a matter of common knowledge and invades the province of the jury.

Some more recent cases have also dealt with this rule, particularly in the area of testimony regarding the dynamics of child sexual abuse.  Commonwealth v. Purcell, 403 Pa.Super. 342, 589 A.2d 217 (1991), the Court acknowledged that there is a blanket rule that the dynamics of child sexual abuse may not be used to bolster the credibility of an alleged victim of child abuse.  This case is particularly notable with respect to the instant case, because it cites O'Searo, and also because it indicates that, even though some of the cited cases were decided after the trial, in that case, the rule was well settled prior to trial.  Purcell at 233, fn 7.

While it is acknowledged that the trial in Purcell occurred a few years after the trial in the instant case, the Court's finding that the rule regarding expert testimony being admissible for bolstering the credibility of a witness was well established prior to that date is noteworthy.  It has been a well-settled principle well before the trial in this case that expert testimony is only admissible when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman.  Where the issue involves a matter of common knowledge, expert testimony is inadmissible.  O'Searo, supra, Collins v. Zediker, 421 Pa. 52, 218 A.2d 776 (1966).

best
5

19

At the time of trial, the case law was not as extensive as it is currently in this area. However, the law has not really changed in this matter, but rather has been further explained in the more recent cases. Most of the recent cases have their roots in O'Searo, which was decided nearly five years prior to trial in this matter.

Based on this analysis, the testimony of the psychologist was inadmissible because its main purpose was to increase the credibility of the eyewitness by explaining her failure to identify the defendant. This was clearly a matter within the province of the jury.

> ### C.    Failure to object to the expert testimony constituted ineffective assistance of counsel.

Counsel failed to object at trial to this expert testimony, which, as analyzed above, was inadmissible. This failure constituted ineffective assistance of counsel of so serious a nature as to undermine the truth-determining process of the trial.

In Commonwealth v. Kimball, 453 Pa.Super. 193, 683 A.2d 666 (1996), the Court held that the ineffectiveness standard for purposes of the PCRA are the same as those on direct appeal. In order to prevail on an ineffectiveness claim, the defendant must prove: that the underlying claim is of arguable merit; that counsel's performance was unreasonable; and that the defendant's case was prejudiced as a result. Kimball, citing Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (1987).

The arguable merit of the defendant's claim has been established earlier in this brief: that the testimony of the psychologist who treated the eyewitness/victim was inadmissible because it bolstered her testimony. This is a claim that has merit as stated above, and is sound basis for relief under the PCRA.

16

Post
6

The second question is whether counsel's performance was unreasonable. In determining the reasonable basis of counsel's course of action, the Court must decide whether counsel's decisions were reasonably designed to benefit the client. <u>Kimball</u>, supra. In this case, counsel's actions were not reasonable. The failure to object after hearing the Commonwealth's offer of proof regarding the psychologist was a glaring omission and was not the result of any rational strategic decision.

As has been demonstrated, the psychologist's testimony was inadmissible. However, because of counsel's failure to object, the testimony was admitted by the Court. This course of conduct could not have benefitted Mr. Arnold, because it corroborated, explained and otherwise bolstered the testimony of the chief witness. Had defense counsel objected, it is the defendant's contention that the testimony would not have been admitted and the jury would not have heard the testimony which supported that of the witness and invaded the province of the jury to determine credibility.

While it is arguable that there was some value to the defense from this testimony, that argument can be refuted. It is true that the testimony revealed that the witness was unstable and suffered emotional problems. However, this information could have been elicited by the defense during cross examination of Jane Moran. Therefore, that basis was not a rational one in support of failing to object to the expert testimony.

The final element the defendant must prove in order to prevail on an ineffectiveness claim is that he was prejudiced by counsel's unreasonable act or omission. While the Commonwealth may try to claim that "overwhelming evidence" of the defendant's guilt would render any error by counsel harmless, it is important in this case to look to the source of the evidence in support of guilt. Counsel allowed testimony which bolstered the credibility of perhaps the most important Commonwealth witness, the only eyewitness.

Jane Moran testified as to the events on the night of the murder, the description of the assailant, description of the truck and its contents, and several details regarding the crimes committed. She also identified key pieces of evidence, including the murder weapon, the box that the weapon was carried in and a cooler that was in the assailant's truck on the evening of the murder.

This testimony was certainly important in obtaining a conviction. Strengthening this witness's testimony certainly affected the outcome of the proceeding. Counsel's inaction here seriously undermined the truth-determining process, because most of the evidence stemmed from the account given by Jane Moran. Without the expert's testimony, doubt could have been cast regarding her credibility, due to her lack of ability to identify Dale Arnold as the assailant. By invading the jury's province on that issue, the expert testimony improperly bolstered her account. This is certainly serious enough error to constitute prejudice.

Ground
5

Conviction obtained by the Knowing Use of False Testimony

and the False Idenification of the Killers.

The Killers Idenification          False Statements

It was after Midnight on a dark rual desulated parking lane, on a

top of a hill top road over looking 2 rivers, with a parshall Moon

overhead.Philip Evans and Jane Moran were parking, Moran's head in

Evans lap, sucking on his Penis. Oral Sex as Moran testified to. Then

Evan's car door flew open, a shot rang out, the car bussers went off,

the over head light came on, Evans flew out of the car, and the car

door slamed shut. All within a second or two. Putting Moran back into

total darkness again. Moran testified to seeing shadows outside the car

and hearing Evans voice..They Shot Me.., They blew off my arm.,Theyre

shooting me.

Now according to Moran's Testimony, They means,2 or more people

were shooting Evans. Moran stated,she seen shadows outside the car,

meaning 2 or more people were outside the car. But Moran couldn't

idenifiy anybody, she couldn't really see anybody, only shadows. So

who the Killer was, Moran didn't know, Moran didn't see any weapon,

Moran didn't see the Killers. No Idenification was ever made on who the

Killers were. But when the District Attorney Frawly gets the case,

" They blew off my arm ", turns into one Killer, the Petitioner.

And no other Killers or accomplices were ever named or charged in this

case.

Then Moran testified to somebody getting into the car with her.

Telling her to get into the back seat, and put her face into the seat.

Then this person kidnaps her by driving away with her and the car.

Stopping awhile later and getting into a Fire Engine Red Truck with a

stick shiff. Moran testifys to the Penna. State Police, this person

has Red Hair, a 3 inch Red Beard, Brown Eyes, 160 to 180 lbs., 5'6" to

5'8", with a Red Truck. Finger prints takenof Evans car and Hair samples

taken too. Moran names her old Boy Friend as the Killer-Kidnapper.

Then weeks later Moran recants her testimony.

15 months later, Petitioner is arrested for this crime. The DA

changed Moran's story, to one killer-Kidnapper and no accomplices.

The Petitioner has dark brown to black hair, no beard or was 2 to 3

days growth, 200 plus lbs., Blue Eyes, and drove a Powder two tone Blue

Ford Ranger 1974 4 wheel drive Pick up Truck. No Finger prints or Hair

of the Petitioner was found in the Evans Car, or on Moran. No Idenificati

of the Petitioner was ever made at a Police Line Up, as Killer or Kidnap

Moran never ID. the Petitioner or his voice. No other people were ever

mention as Killers or Kidnappers in this case, by the District Attorney

Frawly of the Penna. State Police.

Moran and Pa.State Police repeatedly testified, that Moran made at

least 7 different statements on what happened in this case. Moran

repeatedly changed her story, then Moran testified that the Pa.State

Police had repeated threatened her with arrest. Then Moran got an

Attorney to protect herself, Moran went thru many hours of Hypnosis,

was Hypnotized many times by a Doctor and Pa.State Police. Then the

Doctor-Psychiatrist Marley got an Attorney to protect the Doctor.

Then Moran thru her Attorney gets an Immunity Deal from the DA.Frawly,

that Moran would never be arrested in this case.

Now Moran has been involved in 3 Deaths of Boy friends dying

suspiciously around her. The night of this crime, Moran testified to

being at a party, doing Drugs and drinking Alocholic Beer, doing Speed,

Hash, and Marijuana with Mike Alt, the Robert Packers Hospital

Presidents son, where she worked as a Nurse.

This is the only witness to this crime, inwhich Pa.State Police and

DA. used, although Moran Perjured herself over and over again, the DA.

still used her to convict the Petitioner.

Inwhich the Pa State Police and District Attorney did Knowing Use

False Testimony to convict the Petitioner.

The Petitioners United States Constitutional Rights were violated by

all prior Counsel which rendered ineffective by failing to adequately

argue and preserve one and/all of the following issues raised in this

instant motion which are as follows below and minus all prior counsel

errors the final outcome would more than likely to have been

reasonably different.

All of the Evidence in this criminal trial is similar to what all

the witness testify to. No evidence was linking to the Petitioner,

which all evidence was highly inflamitory and prejudical to the

Petitioner in the eyes and minds of the empanel jury, which was in

direct violation of the Petitioner's United States Constitutional

Rights of a fair trial and Due Process and Equal Protection of the

Law as manadated by Law.

Morans whole story, Statements, and Testimony were lies, false

statements, fabrications, inconsistencys, perjury, unreliable witness,

and a fraud. Moran is a highly suggestive person, saying basely anything

you want her to say. So many false and perjured statements.

And all Petitioner's prior counsel rendered ineffective for failing

to raise this issue and minus errors. The outcome of the final decision

would more than likely to have been reasonably different.

See and Compare,

Imbler v.Craven,

    Knowing use of False Testimony

    Inconsistant Statements

    Perjured Testimony

    False Testimony

PLE Book   Perjury

    Definition of Perjury is making different statements under oath

    consummate Perjury.

Strickland v.Washington,80.Led.2d.674,104.Sct.(1984).

Jay Smith Case...Com.v.Smith (Jay),404.Pa.Super.553.591.A2d.730.(1991).

United States Constitutional Adments 5th., 6th., and 14th.

- 6 -

Conviction was obtained by the District Attorneys Office by making
<u>Deals and Immunity Deals</u> with Criminals for NO CHARGES.

Many people in the Petitioner's case was given Deals with No Charges
or Immunity Deals for Crimes these people have done. Some of these
Deals were put on the Record. These Immunity Deals leads to making
False Statements, Fabrications, and out right Lies. They will say
anything about the Petitioner, as long as they are not charged with
any Crimes.  The Jury didnot here of these Immunity Deals.

   Petitioner's U.S.A. Constitutional Rights were violated by all
Prior counsel which renered ineffective by failing to adequately
argue and preserve one and/all of the following issues raised in this
instant motion which are as follows herein and minus all prior counsel
errors the final outcome would morethan likely to have reasonably
different.              *Informant Immunity Deals.*

   All prior counsel failed to adequately argue and preserve this issue
and therefore minus trial counsels errors the final outcome of the
final decision would more than likely reasonably have been different
and the jury would have found the Petitioner Not Guilty.
A violation of the 5th., 6th., and 14th. U.S.A. Constitutional Rights.

   In June of 1979, Petitioner was arrested for an unrelated charge to
this case. The co-defendant Michael James Vanderpool was given total
Immunity by Penna. State Police for any crimes he did, as long as he
told the Police everything about the Petitioner, his house, his truck,
his car, his women in his life, his social life, to gain information
about the Petitioner and this instant case. For the last 20 years, this
person has been involved in beating and robbing a woman for money,
killing a Binghan New York woman in 1978, killing a guy in Windom Pa.
in 1978 or 1979, steeling cars, growing Marijuana and selling it, Bar
room fights and many DUI charges.

Jane Marie Moran was giving an Immunity Deal. Just hours before Philip Evans death, Moran was at a party with Mike Alt, the son of the Robert Packer Hospital President. Moran was smoking Marijuana, popping pills-speed, drinking beer and smoking Hash. Heavey drug user. Moran is a loose woman, who was a witness, if not some what involved in the Murder herself. Some of Morans girl friends stated what they went through and what Moran went through. Moran seeing and/or taking on 3 guys for sex, and she had a strange relationship with her Mother. One of Moran's girl friends used drugs and gets it on with one gut and and another woman at the same time, a 3 some. Another one of Morans friends is sexually obessed with surgery and goes home and masterbates. Moran witnessed a murder and is involved with a boyfriend with a Red truck, which Moran I D as the killer, then changed her mind. Moran described the assailent with Red hair & beard. Moran told or stated the murder was a Mafia Hit, either by the killer or by Morans close friends. Moran lied over and over again to the police. Moran was involved in drugs, her statements are lies, fabrications, false statements, inconsistencys, unreliable witness. Moran is a highly suggestive person, saying basely anything you want her to say. Moran gave many false and perjured statements to the police, so many that she dont remember how many, police stated that she gave at least 7 different false and perjured statements. Gets Hypnsositzed, another different statement. So she get a Attorney and get a Immunity Deal. Now 3 strange deaths in her life.

Fay Coyne an inmate at the State Prison at Rockview, Pa., contacted Pa.Police at prisons main gate, that he had some information for them on the Petitioner. Coyne use to read the Petitioners newspapers from their hometown, which every now and again had this instant case in it, and Petitioners past case.  Coyne wanted a Deal from the Pa. Police, bring him to the Bradford County Jail, let his see his mother, phone calls, A McDonalds Big Mac and Fries, and early Parole. Which the Pa. State Police and the DA Office aggreeded to. Now the Petitioner didnt know Coyne and the Petitioner doesnt talk about his past. So whatever Coyne said to Police and at the trial, he made it all up. Which leads to False Testimony, Fabrications, and out right lies.
While Coyne was was in the Bradford County Jail, he got visits, got in Marijuana and sold it to other inmates, he was a Trustee, he stole Keys to the Prisona back door, gave them to other inmates, which many did escape durning the Petitioners trial, thru the prisons back door. Coyne was not charged. Coyne gets out of jail. Breaks into somebodys car windshield. No Charges. Then Coyne breaks a house window. No Charges. Coyne sells drugs, Marijuana and Cocaine and gets caught by the Pa and New York Nark Tast Force. No Charges. The Nark Tast Force turns Coyne in a Informant for the last 15 years. Then a few years ago, Coyne is caught lieing and with drugs to the Nark Tast Force, and gets convicted of Drug Charges. Coyne is now at Rockview State Prison, Pa. again.

Al Raymond was giving an Immunity Deal. Raymond was from New York City, New York .He has changed his name many times. Al Shaprio, Al Bennett, Al Raymond, Romono Sharprio. Raymond had this .22 rifle for 30 years. He cut off the Barrel and stock to make a .22 semi auto pistol with a Silence on it, and he made a box to carry it in. Raymond made this gun to kill his exwife in NYC NY. So he could get custody of his 2 children. Raymond was going to pay anybody $ 5,000. to kill his wife. Petitioner say no. Raymond and Petitioner used this gun to shoot deer with for meat for the freezer. Raymond was caught by Pa.State Police with this gun in his garage. Raymond was giving an Immunity Deal for everything he knew about the Petitioner, if no deal he would be arrested Raymond also ran a Burglary ring, steeling other peoples property and taking it to NYC,NY. to sell, Bikes,Guns,Furniture. Raymond was caught with some stolen property. no charges.

Wallace Arnold was given an Immunity Deal. Petitioner was arrested
June 1,1979 at his home and property. Wallace Arnold is the Petitioner's
Father. He then took over everything the Petitioner owned, value $ 75,00
3 bedroom Ranch House,2 acres of land,1974 Blue Ford Truck,1973 AMC
Green Car. Petitioner's old Girl friend Mary Beeman and her 2 sons
were still living in this house. Pa.State Police was harassing the
Petitioners father and old girl friend for days with Murger Charges,
if they didnt corporate with the Police, or they will be arrested, and
Mary Beeman will have her kids taken by welfair, and they will all be
in Jail. Wallace Arnold took the Petitioners Pistols and melted them
down with his weilder. Took his Blue Truck, and totally cleaned it out,
and water hosed the inside and outside out also. Wallace Arnold always
told Pa.State Police, he had no ownership over the property or over the
truck and Land property, or had no Power of Attorney over his sons,
the Petitioner. Pa.State Police repeatedly threatened Wallace Arnold
to Search the house, saying we need no Search Warrent, we are the Police
So a few days after the Petitioners arrest, June 4 or 5th, Pa.State
Police got a old case that was over 6 months old, got a Stale Search
Warrent to get into this house. Then over the investagation, information
came out that Wallace Arnold ordered the burning of Mike Hortons house
down in 1977-78. Wallace Arnold ordered the burning of Joanne Hortons
Barn in 1978-or79. Wallace Arnold Raped Mary Beeman week after the
Petitioners arrest. Mary Beeman told Lula Felicita,Petitioners wife.
Then later Mary Beeman gets pregnant, has a girl child. Wallace Arnold
takes Mary Beeman to a Lawyer Office, makes her sign papers that he is
not the father of this child, so he doesnt have to pay child support.
Years later Wallace Arnold hides $ 50,000. from the IRS.
Since 1976-77 Wallace Arnold built part of his Trailer Court on some
bodys elses land and made over $ 300,000. in the past 24 years off it.
Around 1990 trying to drown Mary Beeman in a hot tub. No charges. Immuni

Ground.
7.

DID THE HONORABLE PRETRIAL HEARING COURT ERR IN REFUSING
TO SUPPRESS A .22 CALIBER RIFLE AND A CARDBOARD BOX WHICH WAS
SEIZED AS A RESULT OF A CONVERSATION INTERCEPTED WHILE THE DEFENDANT
WAS INCARCERATED?

On June 3, 1979, Phillip Shamoun, an off duty guard
at the Bradford County jail, allegedly overheard a conversation
between the Defendant and one Al Raymond, a visitor of the Appellant.
As a direct result of the contents of this intercepted conversation,
the State Police came into possession, through Mr. Raymond, of
what later was shown to have been the murder weapon.

However, Trooper John George had specifically spoken
to Mr. Shamoun and asked him to listen in and attempt to overhear
any conversation between the Defendant and any visitors. (N.T.
pretrial hearing January 13, 1980, pg. 90) On direct examination,
Mr. Shamoun indicated that he was working a regularly scheduled
shift that day and had signed Mr. Raymond in. However, it was
later discovered that Mr. Shamoun was scheduled to be off that
day and did not sign Mr. Raymond in. Further, his step-son was
also employed as a guard at the Bradford County Prison that day
and was with him but did not overhear any of the conversation.
On the other hand, Mr. Shamoun indicates that the two individuals
were shouting the contents of their conversation about. (N.T.

32

pretrial hearing January 13, 1980, pgs. 129-142).

The threshold question becomes one of whether or
not Shamoun can be termed an agent of the police.  If not, the
matter is not an issue for suppression in any event. However,
in the case of U.S. v. Henry, 65 L.Ed.2d. 115, (1980) the U.S.
Supreme Court issued a ground breaking decision.  In that case
the Appellant had been indicted and was incarcerated pending
trial. Government Agents contacted an inmate confined to the
same cell block as he and requested that he alert them to any
statements made by the individual.  The agent also cautioned
the inmate not to initiate any conversations with the Defendant
concerning the charges for which he was imprisoned. Upon his
release the inmate testified against the Appellant.  The Supreme
Court held that the introduction of this testimony violated the
Appellant's Sixth Amendment right to assistance of counsel.

Upon reviewing the record, it is obvious that Shamoun
stepped beyond the boundaries of an ordinary citizen. He was
specifically requested to attempt to intercept conversations
and report them to a member of the State Police.  He went to
the jail and positioned himself so that he might be able to overhear
the conversations of a particular defendant. He appeared at the
prison on a day in which he was not scheduled to work nor being
paid to work.  Further, it is intriguing that even his step-son,

who was with him at the time the conversation took place did
not overhear a single word of the conversation.  Under the cir-
cumstances as admitted by Shamoun at the pretrial hearing, there
can be no other rationale for his appearance at the Bradford
County Prison on June 3, 1979.

The next question to be discussed is the expectation
of privacy which Arnold may have reasonably been expected to
enjoy while incarcerated.  The Commonwealth relies on the case
of Lanza v. New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d.
384 (1962).  However, in that case the Supreme Court also pointed
out that the intercepted conversation was not used in a criminal
proceeding against the Petitioner.  Further, Lanza has been undercut
by the Supreme Court's later decision in Katz v. United States,
389 U.S. 347, 88 S.Ct. 507, 19 L.ed.2d. 576 (1967). Post-Katz
decisions dealing with jail house searches and seizures have
apparently treated Katz and Lanza as compatible. See U.S. v.Dawson,
516 F.2d 796 cert. denied, 423 U.S. 855, 96 S.Ct. 104, 46 L.ed.2d.
80 (1975); U.S. v. Hitchcock, 467 F.2d. 1107, cert. denied, 410
U.S. 916, 93 S.Ct. 973, 35 L.ed.2d. 279 (1973).  These later
cases have held that an intrusion by jail officials pursuant
to a rule or policy with a justifiable purpose of prison security
is not violative of the Fourth Amendment. See also  U.S. v. Savage,
42 F.2d. 1371, cert. denied, 415 U.S. 932, 94 S.Ct. 1446, 39
L.ed.2d. 491 (1973).

34

Accordingly, it has been held by the Supreme Court of the United States that a prisoner is not deprived of his Fourth Amendment protections totally.  Rather, the rule has evolved which recognizes the government's countervailing interest in prison security and order.  <u>Procunier v. Martinez</u>, 416 U.S. 396, 94 S.Ct. 1800, 40 L.ed.2d. 224 (1974).

The instant case is distinguishable inasmuch as the Commonwealth cannot state that the actions undertaken by Shamoun were part and parcel of an offical policy to maintain prison security.  Again, there can be only one explanation to indicate the presence of Shamoun on that day.  Therefore, pursuant to the holding of the United States Supreme Court in <u>WONG-SUN V. U.S.</u>, 371 U.S. 471, 83 S.Ct. 407 9 L.ed.2d. 441 (1963) and the Pennsylvania Supreme Court in <u>Commonwealth v. Cephas</u>, 447 Pa. 500, 291 A.2d 106 (1972), the statements and the resulting seizure of the rifle were invalid inasmuch as they were obtained in violation of the Defendant's constitutional rights.

This Prison Guard was caught in his lies in open court, then Recants part of his testimony. The Defendant-Petitioner states that he never made no such conversation .  *Informant Immunity Deal.*

35

*Ground 8*

:DID THE HONORABLE TRIAL COURT ERR IN PERMITTING TESTIMONY BY A COMMONWEALTH WITNESS AS TO AN ALLEGED CONVERSATION WHICH OCCURRED IN BRADFORD COUNTY PRISON INASMUCH AS SUCH TESTIMONY INFORMED THE JURY PRIOR CRIMINAL ACTIVITY OF THE DEFENDANT?

During the trial, Phillip Shamoun, a guard at the Bradford County Prison testified as to the contents of a conversation which he was alleged to have overheard in that location. Prior to the introduction of this testimony, the defense requested that the location not be brought out before the jury. However, on direct examination, the fact that the Defendant was incarcerated was pointed out time and again to the jury.

In Commonwealth v. Allen, 448 Pa. 177, 292 A.2d 373, (1972) the Court held that "the fact that a reasonable inference of a prior criminal record is present in the minds of the jurors in and of itself mandates a new trial". See also Commonwealth v. Harkins, 459 Pa. 196, 328 A.2d 156 (1974).

Further, though the Trial Court gave cautionary instructions to the jury, they had to be repeated a number of times due to the insistance of the prosecution to reiterate the fact numerous times. A similar occurrance is found in the case of Commonwealth v. DeCampli, 243 Pa. Super. 69, 364 A.2d 454 (1977).

*36*

In that case a new trial was awarded because of the "sheer number

of times that the Court was forced to give cautionary instructions

which only served to underscore the meaning of the prejudicial

testimony".

The Supreme Court of Pennsylvania has held that the

test to be utilized in such a situation is whether the testimony

conveys either expressly or by reasonable implication the fact

of the Defendant's prior criminal activity.  Commonwealth v.

Povish, 479 Pa. 179, 387 A.2d 1282 (1978).  Again, the defense

submits that this is but another example of the studied pattern

of abuses which the Commonwealth undertook to strengthen its

admittedly circumstantial case.

37

Ground
9

11.  DID THE HONORABLE TRIAL COURT ERR IN PERMITTING A NUMBER
OF COMMONWEALTH WITNESSES TO TESTIFY AS TO THEIR "STATE OF MIND"?

        Throughout the trial the prosecution questioned various
witnesses as to their rationale for performing certain actions
or requested of them an answer as to what was going through their
mind at the time they performed certain actions.  The Commonwealth
always sought to introduce these statements under the theory
of the "state of mind" exception to the hearsay rule.  The defense
submits that their only purpose for inclusion into the testimony
at the trial of this case was to inflame the passions of the
jurors to a point at which a fair trial would be impossible.

        The Trial Court in its opinion indicated that the
testimony of one Jane Moran was referred to by the Commonwealth
as being offered to show her "state of mind".  However, a review
of the record will show that she was not the only witness whose
testimony under this exception to the hearsay rule was offered
and admitted over objection.  If there had been alleged statements
made by the Defendant, himself, or someone who was not available
to testify in court as to the Defendant's state of mind which
would bear on his sanity or as proof of the motive for the killing,
the Defendant would have no basis to object.  However, in this

77

38

trial the witnesses were asked questions as to what "was going through your head at the time certain actions took place?" In short, it constituted a transparent attempt to inflame and arouse the jury through an appeal to their sympathy.

However, the Prosecution's argument misses the mark. The general rule as stated in Wigmore on Evidence, §1759 is:

> "Whenever an utterance is offered to evidence the state of mind which ensued in another person in consequence of the utterance, it is obvious that the utterance is therefore admisssible so far as the hearsay rule is concerned". See also Commonwealth v. Filer, 249 Pa. Super. 349, 378 A2d. 330 (1977).

Therefore, it is clear that extra-judicial declarations made by a person who cannot be called as a witness and are relied upon to show solely an existing intention or state of mind of that declarant are admissible in evidence as an exception to the hearsay rule, provided such declarations appear to have been made in a natural manner, not under circumstances of suspicion, and they are material and relevant to the issues involved. See also Commonwealth v. Wilson, 394 Pa. 588, 148 A2d. 234 (1959); Commonwealth v. Thomas, 410 Pa. 160, 189 A.2d 255 (1963); Commonwealth v. Riggins, 478 Pa. 222, 386 A.2d 520 (1978).

The defense submits that a review of the record would indicate that this "exception" was utilized to show the state

39

of mind of the witnesses who had testified.  Further, the defense again submits that such testimony was inadmissible due to the prejudicial nature of its content and its admission, based upon a reading of the entire record and in conjunction with the other irregularities complained of, require the grant of a new trial.

40

*Ground*
*10*

DID THE HONORABLE TRIAL COURT ERR IN ADMITTING INTO EVIDENCE
THE TESTIMONY OF A NUMBER OF COMMONWEALTH WITNESSES OFFERED TO
SHOW THE DEFENDANT'S "CONSCIOUSNESS OF GUILT" WHEN THERE WAS
NO EVIDENCE TO SHOW THAT THE DEFENDANT ATTEMPTED TO FLEE OR
CONCEAL HIS IDENTITY?

At numerous times in the trial, the Commonwealth
introduced testimony of acquaintances and fellow employees concerning
alleged actions undertaken or not undertaken by the Defendant.
The defense interposed timely objections to such testimony.
The testimony was permitted under the theory proffered by the
Commonwealth that it showed the Defendant's "consciousness of
guilt".

The defense submits that it is well settled that
flight and concealment are admissible to show "consciousness
of guilt".  However, there is no testimony that the Defendant
fled the jurisdiction nor even the immediate area of the offense.
Further, there is no evidence that the Defendant attempted to
conceal his identity through the use of an assumed name.  See
Commonwealth v. Collins, 440 Pa. 368, 269 A2d. 882 (1970).

When a person commits a crime and thereafter flees,
attempts to elude the police and conceals himself, or abandons

his normal pattern of living, such evidence may be admissible
to show his consciousness of guilt. Commonwealth v. Peterson,
271 Pa. Super. 92, 412 A2d. 590 (1979).  In the instant case
there is no evidence of such actions.   On the other hand, it
has been held that false or contradictory statements by an individual
accused of a crime are also admissible since a jury may infer
that such statements were made in an attempt to divert suspicion
or to mislead the police. Commonwealth v. Sullivan, 472 Pa. 129,
371 A2d. 468 (1977).

     The Trial Court in its opinion cites Commonwealth
v. Klick, 272 Pa. Super. 61, 414 A2d. 669 (1978) as controlling
in this instance.  However, in the Klick case it was clear that
the Defendant there had told another that he would "take care"
of a witness.  Further, he had gone so far as to have  telephoned
the witness's apartment prior to trial.  He had also apparently
indicated to the witness that he would "kill her" if she testified.
It is little wonder then, that the Superior Court held in that
case that they had "little trouble with the admission of such
testimony".  However, the Klick case stands for the proposition
that the Commonwealth may show an attempt by the Defendant to
intimidate its witnesses.  In the instant case, the Trial Court
in its opinion pointed out the testimony which it felt led to

42

this assumption. (Trial N.T. pgs. 1159-1162, 1169).  However,

on cross-examination it was merely pointed out that Arnold only

indicated to Mr. Coyne that he did not want a certain person

testifying.  The words "hush-up" were the Commonwealth's witness's

own.  Beyond this, there was no other testimony solicited on

the part of Mr. Coyne.  Again, the case cited by the Commonwealth,

Commonwealth v. Kramer, 247 Pa. Super 1, 371 A2d. 1008 (1977)

is another example in which an actual attempt to intimidate a

witness was proven. In that case a letter had been sent to the

 witnesses who were to testify. Both the Trial Courts opinion

and the Commonwealth's post-trial brief point to cases which

involved a direct attempt to fabricate a false document, bribe

a witness, intimidate a witness, destroy or conceal evidence,

corrupt a juror or flee the jurisdiction. They have shown nothing

of the kind in this case.  What they have done is admit a vaguely

worded recollection by another inmate of a state institution

of an alleged conversation which that individual had with the

present Defendant.  There was no overt act alleged to have been

completed in this matter, therefore there can be no attempt.

At most, the facts could possibly be stretched into an example

of "puffing" by one inmate to another.

43

The defense submits that the admission of such testimony over objection, was part and parcel of a prejudicial attempt by the Commonwealth to create a case of guilt by inference and violate the Appellant's constitutional right of due process.

DID THE HONORABLE PRETRIAL HEARING COURT ERR IN REFUSING
TO COMPEL AN AMENDMENT OR REDACTION OF THE INFORMATION OR IN
THE ALTERNATIVE SUPPRESSING ANY TESTIMONY REFERRING TO ALLEGED
OFFENSES OF RAPE WHEN THE DEFENDANT WAS NOT CHARGED WITH SUCH
CRIMES?FURTHER, DID THE HONORABLE TRIAL COURT ERR IN REFUSING
TO GRANT A MISTRIAL DUE TO FREQUENT REFERENCES BY THE PROSECUTION
AS TO SUCH ALLEGED INCIDENTS OF RAPE?

   Jane Moran, the prosecution's central witness, testified
that on the evening in question she was raped twice.  However,
she was not certain as to whether or not these acts of forced
sexual intercourse occurred within the boundaries of Pennsylvania
or New York.  For this reason, the Commonwealth never formally
charged the Defendant with the offense of rape. However, the
criminal informations to a number of the charges contained references
to an offense of rape.  Further, at trial this was brought out
forcefully on direct examination by the prosecutor and he again
remarked on this in his closing statement to the jury.

   The general rule is that evidence of unrelated criminal
activity is not admissible except under certain circumstances.
These special circumstances have been held to exist when the
evidence of the unrelated criminal activity tends to establish
the following: (1.)  motive; (2.)  intent; (3.) absence of mistake

or accident; (4.) a common scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the other; or (5.) to establish the identity of the person charged with the commission of the crime on trial. Commonwealth v. Peterson, 453 Pa. 187, 307 A.2d 264 (1973). It is obvious that the crimes in the instant case do not fit within any of these delineated exceptions.

However, the Appellant is aware of the holding in the case of Commonwealth v. Davenport, 286 Pa. Super. 212, 428 A.2d 647 (1981). This case held that "while evidence of the same transaction" sometimes inappropriately called 'res gestae' have been generally treated as an exception to the rule barring evidence of prior crimes, this treatment appears conceptually incorrect. Evidence of the same transaction is not evidence of a prior transaction or crime, therefore it need not be excepted from the general rule because it does not fall within the purview of the rule to begin with". Commonwealth v. Davenport, 286 Pa. Super. at 216 n.1, 428 A.2d at 649 n.1.

This line of cases cites Commonwealth v. Brown, 462 Pa. 578, 342 A.2d 84 (1975) in saying "such evidence is admissible where such prior conviction, or criminal act form a part of a chain, or one of a sequence of acts, or became part of the history of the event on trial, or was part of the natual development

of facts".   See also <u>Commonwealth v. Lee</u>, ____ Pa, Super.___
443 A.2d 804 (1982).

However, the Appellant contends that the holding
in <u>Davenport</u> is correct in pointing out that such questions do
not fall within the exception.   The central case, <u>Brown</u>, Supra.,
treats these types of questions as falling within the exception.
It would appear that such an exception is unfounded and the Appellant
respectfully urges this Honorable Court to declare such evidence
inadmissible.   Again, the defense submits that based upon the
totality of the circumstances surrounding this case that the
prosecution offered such evidence in an attempt to arouse the
sympathy of the jurors and inflame their passions against the
Defendant rather than to "flesh out the details of the incident".

*Ground 1-2*

## Jury Views the Petitioner in Hand Cuffs

Petitioner's United States Constitutional Rights were violated by

all prior counsel which rendered ineffective by failing to adequately

argue and preserve one and/or all the following issues raised in this

instant motion which are as follows below and minus all prior counsel

errors the final outcome would more than likely to have been

reasonably different.

Petitioner was seen in handcuffs by the jury at Petitioner's criminal

trial which was highly inflamtory and prejudicial to the Petitioner

in the eyes and minds of the empanel jury, which was in direct violation

of the Petitioner's United States Constitutional Rights of a Fair Trial

and " Due Process " and " Equal Protection of the Law " as manadated

by Law

Durning the Petitioners Trial, The Sherrif and Prison Guards lead

the Petitioner around in Hand Cuffs and Leg Irons. On many occasions

the Jurors had seen the Petitioner in HandCuffs and Leg Irons, in the

courtroom, in the hallways of the courthouse, coming and going from

the courthouse and the handcuffs were piled on the floor by the

Petitioner durning the criminal trial was going on, many handcuffs,

leg irons and wastebelts for handcuffs.

The Petitioner told the Bradford County Sherrif Thomas Fairchild about

it, and the Sherrif told the Petitioner to keep quiet about it.

So the Petitioner then told his Attorneys about it, and they went to

the Bradford County Judge Evans Williams about it, and had this matter

put into the record.

Notes of Testimony of March 6, 1981, page 20.(or 200).

Side Bar:
Attorney Harcho:
May it Please the Court, Mr.Arnold just told Miss Mils and myself that
some of the jurors saw him brough back in here in handcuffs,apparently
two of the male jurors saw the handcuffs, he indicates the two
alternates, as far as he known. Therefore, I respectfully request
a Mis-Trial.
The Court:
The court denies the motion, has previously conferred with those
responsible for bringing the defendant here. The Court will reinforce
its arrangements, if in fact, what the defendant alleges is True.

49

The Court will consider the matter and determine if additional
instructions to anyone are necessary.

And all Petitioner's prior counsel rendered ineffective for failing
to raise this issue and minus counsel errors. The outcome of the final
decision would more than likely to have been reasonably different.

See and Compare;

US V Apodaca,843.F2d.421.(10th.Cir.)(1988).

United States Comstitutional Adments 5th.,6th., and 14th.

Ground
13

The Petitioner's Attorney failed and the Courts failed to Protect the Petitioners Constitutional Rights, because none asked for, or gave Cautionary Instructions to the Jury on,

Alibi Instructions

Spouse Special Instructions

Eye witness Instructions

Drugs, Alochol and Mental Illness

The Petitioner's trial lasted 4 weeks, and after many days of testitmony on the above issues, the attorneys or the court gave any Special Cautionary Instructions. Which leads to Prosecutor Misconduct in the Petitioner's 1981 case, Flagrant Misconduct and this is clear Federal Constitutional violation amounted to State Proseutorial over-reaching because it subjected Petitioner to a Fundamentally Unfair Jury Trial.

Petitioner suffered extreme prejudice of continued incarceration for well over Twenty (20) years and all of the lengthly delays has deteriorated his chances for presenting any reasonable defense and prevents him from gathering and presenting defense evidense for any retrial of this case by the Commonwealth, all of which is to Petitioner Prejudice.

Alibi Defense, Specific Jury Instructions, Cautionary Instructions

Com.v.RoxBerry, 506 Pitts 1988.

Com.v.Pounds, 490 Pa.621., 631-632, 417 A2d.597.602.1980.

Com.v.Bonomo, 396 Pa.222.151 A2d..441.1959.

Com.v.Brunner, 341.Pa.Super.64.69-70,491 A2d.150.152-153.1985.

Com.v.Weinder, 359 Pa.Super.608.577A2d.1364.

Com.v.Kloiber, 378 Pa.412.1954
    Cautionary Identification Instructions
    Eye Witness Special Instructions

Stovall v.Denno, 388 US.293.1967.

Foster v.Calif.394.US.440.1969.
    Irreparable Misidentification-under Habeas Corpus

US.EX.Rel.Mathews.v.Johnson, 503.F2d.339.(3rd.Cir.1974).
    Instructions upon request

Com.v.Pitts, 450.Pa.359.301 A2d.646.1973.
    ID of Accused.

Com.v.Mouzon.456.Pa.230.1974.
    ID of Accused

Com.v.Hall.456.Pa.243.1974.
    ID of Accused.

Com.v.Van Wright,249.Pa.Super.Ct.451.1977.

Simmons v.Dalshum, 543.Supp.729.1982.
    Alibi Instructions.

Criminal Trial Manual Pa.          Procedure
                                   Instructions
                                   Identificantion Testimony          page
Com.v.Harris.326.Pa.Super.64.473.A2d.610.(3-16-84).                   PR-3901
                                                                     Brown Book
Com.v.Kloiber,378.Pa.412.106 A2d.820.1954.                           2
    ID at 424,106 A2d.826.                                           ID of
Com.v.Lee.401.Pa.Super.591.585 A2d.1084.(1-30-94).                   Accused

Com.v.Cannady,404.Pa.Super.215.590 A2d.356.(5-6-91).
    Cautionary Instructions or Mistrial-Prejudice.
    Criminal Trial Manual page 5843.

Com.v.New,354.Pa.188 (1946).page 213-215-221.
    Jury Instructions.

Wherefore, Petitioner prays this Honorable Court consider the
foregoing Memorandum of Law in its consideration of this Petition.

Respectfully Submitted,

Date _April 14, 2000_

P. R. Arnold

Dale Arnold